Judge Moore is detained this morning. She will listen to the argument and participate. She will also probably arrive sometime during the arguments this morning, but we'd like to proceed without her. And so, Mr. Stantley? May it please the Court, this case is here on a summary judgment decision by the district court, and we wish to note that there are numerous material questions of fact, which we believe the lower court overlooked. To begin, there was no prima facie showing of obviousness against this patent, the 182 patent that we are here about today. An important element of the 182 patent is that there is no gel existing on just one side, excuse me, there is gel on only one side of the fabric. This is an important advancement for amputees. Amputees' legs fit inside a hard socket. That socket has a hard internal shell. If gel is on the outside of the liner, it will rub against the inside of the hard shell socket. It will cause friction and sounds, embarrassing sounds. It will also cause eventual blowout of the liner. Didn't silo sheath sell a one piece with the elastomeric and fabric combined? Your Honor, silo sheath was a one piece device. However, it was designed to work with other socks on top of it. It's a very thin item made of almost like women's hosiery. That's sort of a thin nylon with the gel attached to it. The gel bled through that device and came through on the outside. I noticed in the exhibit that was furnished to us of the silo sheath product, the closed end looked to me to be much thicker than the rest of the body of the structure. That closed end did not seem to have any sort of bleed through. It looked to me like both the polymeric lining and the fabric around it were both a little bit more substantive than the rest of the structure. Almost in and of itself seemed to meet the terms of this claim. Your Honor, any gel on the outside of the liner, whether it's at the end, the part you're talking about, or even more so up the side of the liner, will cause problems. I recognize that, but the question in my silo sheath is enough of a teaching in and of itself when taken in conjunction with the ice-rost structure or the class and patent. Doesn't that provide a pretty compelling 103 argument? We don't believe so at all, Your Honor, because nowhere in the prior art, after many years of litigation, no one has ever discovered anything in the prior art that taught the problem. The problem wasn't even recognized until the inventor of this particular patent was on a hunting trip and had to walk a few miles and eventually obliterated his silo sheath, which is part of the record. What do you consider to be the problem? The problem is that you're going to have blowouts, you're going to have sound disturbances, you're going to have, with the silo sheath, the need for additional socks to fill the void between the socket and the amputee's limb. The problem wasn't even recognized that this gel coming through on the outside was, in fact, the reason for failures. Until that problem was recognized that the gel was sticking to itself or sticking to the inside of a socket, there couldn't have been a solution. For example, when you and I go home at night and we get ready for bed, we take our socks off. It's a one or two second thing that happens. It's routine for us. For an amputee to take a liner off in the old days, it was a chore because the gel would stick to the gel as they tried to unwrap it. With the new devices that have fabric only on the outside, gel only on the inside, the removal takes a matter of seconds. As I understand it, the ice frost device or the Klasson patent that showed a gel liner, a cushion liner, that was intended to be used with a sock over the outside of it, right? There was a recognition of the fact that if you don't put some kind of a sock on the outside, you're going to have difficulty getting it into the prosthetic device. I don't believe that Klasson ever refers to a sock. I don't believe Klasson even refers to a fabric, but Klasson does say that there would be a frictionless type of surface on the outside. The ice frost demonstration video seemed to suggest the use of a sock. Yes, additional layers. Those additional layers take time. For an amputee's life, it's not easy to begin with. Putting on and off additional layers takes time every day. Those layers slip with respect to each other as you walk during the day. Their lives have been made so much better by the innovation that we're here to talk about today. The standalone interface is another important part of this that they can take on and put on and take off one item. We also wanted to point out that the Board of Patent Appeals and Interferences agreed precisely with our concept of gel on only one side being worthy of overcoming any KSR type of obviousness. Even though the BPAI decision, this court is not bound by it, it's certainly persuasive, and we invite the court to look at that. Even if the Klassen and Silosheath items were combined, it doesn't resolve in the present invention. There's no teaching that gel should be kept on only one side in either of those products, and there's no teaching that it would be a standalone interface. I want to move on to the molded end cap that's on the fabric. This is in the dependent claims. The lower court seemed to give short attention to this. We think it's an important advancement. If you're going to have a fabric liner, you have to have some means of keeping that distal attachment in place. It is not easy. The fabric is not something...imagine taking an end cap and trying to adhere it to your clothing, and then imagine walking in it all day, hours at a time. Amputees put a lot of sheer stress and strain on their products, and as a result, it would be very easy for anything adhered to the fabric to come off. These products last six months or longer. This was a major innovation to get that distal end cap to apply to the fabric. We think the district court basically got its decision through hindsight. We also want to point out secondary considerations of non-obviousness. There's abundant evidence in the record that this device was copied. There's abundant evidence that it achieved and still to this day continues to achieve great commercial success. There was testimony... Were those secondary considerations linked to the claimed features? Well, Your Honor, it is difficult to tie secondary considerations. It's something I've struggled with actually in my entire career is how you tie those to the improvements. But we do have... I point you to Mr. Arbogast's declaration, which is at appendix 2594 and following, where he gets into some of these bases for commercial success, people writing letters to the company explaining how they feel this has changed their lives. So I think one bit of evidence, solid evidence, of commercial success is the six-month life or longer. These things are lasting, whereas the old products did not. One of the experts testified that there was a long-felt need in the industry. The inventor testified about the unexpected results. He wasn't expecting this to last as long as it lasts. And finally, in secondary considerations, this product established a whole new category of prosthetic devices. Before this, there were sheaths, there were socks. Now you look in the catalogs, and this is all on the record, there are liner products, including the very company, Silo Sheath, that was cited against us, came out with its own product called the Silo Liner. That concludes my opening comments, Your Honors, and I've saved some time for rebuttal. Thank you. Thank you, Mr. Stanley. Mr. Fee? Thank you, Your Honor. May it please the Court, my name is Richard Fee, speaking on behalf of the Applee Thermocly. There is a key point. Reading the briefs, it's apparent that there is a perception being argued that needs to be clarified. That perception is that, as stated by the appellant, that there was no single, standalone interface on the market that could be combined with a Silo Sheath to make the claimed invention. That is untrue. However, it is absolutely not a disputed issue of material fact that the class in patent teaches these following elements. Obviously, all you have to do is read the patent, but we have specific citations in our briefs pointing these out. The class in patent teaches a standalone interface. Figure 4A of that patent shows the liner, and then it shows the liner being inserted into the prosthetic device without any additional socks, without any additional layers. So, you have the standalone interface clearly taught in class. The class in clearly teaches the outer portion, constituting a frictionless outer layer. That's part of the claimed invention. Now, in the commercial embodiment, it is undisputed, as was pointed out by Judge Lynn, that it was common to put a nylon sleeve over the outside. But the teaching of the class in patent in a standalone claim, Claim 7, clearly teaches a frictionless outer layer as part of the invention. Class in teaches rolling on a liner, which, as Judge Clark noted, is hardly inventive to teach the concept of rolling on and off something that's very much like a sock. Class in teaches making a liner thicker distally, as was noted during Mr. Stanley's presentation. It is. It's much thicker distally than proximally. It's thicker at the bottom than at the top, which is one of the claims of the patent in suit. It also teaches a docking means attached distally. Now, it's important to note that the 182 patent doesn't claim a method of manufacture. It claims an invention. The only thing it tells us about the way to attach the means of attachment to the bottom of the liner is injection molding, which, as this court is well familiar, is just common throughout a variety of industries. And to claim that injection molding, a distal attachment to the bottom of a liner, is the type of inventiveness that the patent laws support should simply be rejected. It's a common sense advancement using a known technique to existing products to yield a predictable result. Now, it is also undisputed that the silo sheet, as was pointed out, is covered, especially at the distal end, at the bottom, at the closed end, is covered on the inside with gel. There is testimony, and although it has been attempted to make a fact issue here, there is testimony it was coated only on the inside with gel, and that is the repeated testimony, deposition testimony of Mr. John Paul Comptis. Even if there was some bleed through on some of the products, which is the most you could ever get out of this record, was that some of the products exhibited some level of bleed through, it still shows that there is a recognition that you should try to coat the inside even if you get bleed through. In other words, the idea of coating the inside was obviously what was done with the silo sheet. More to the point, regardless, Ohio Willowood's own expert witness, John Michael, testified that it was obvious, as the word obvious is used in connection with the patent laws, it was obvious to make a fabric coated gel liner. It was known how to make a fabric coated gel liner, witness the silo sheet. It was known that you should try to reduce the friction on the outside of the liner to aid in the donning and doffing and to prevent friction with the socket. See classic. And John Michael testified that since the 1980s, this has a priority date of March of 1995, John Michael, their expert, not ours, testified since the 1980s, it was quote, his words, not mine, obvious to create a fabric coated gel liner. There is no expert testimony in support of this patent's validity or novelty. None. At best, they say, well, it was difficult. We had to experiment a lot to figure out how to coat the inside of gel. But that's not really what the record says. What the record really says is he experimented a lot with dipping socks. Who is the he? Urs Kanyan, an amputee, not a person skilled in the art, a gentleman who is just dealing with the problem. So what you do is you look at it and you say, gosh, even if there was some advancement over the art, and I suggest that there actually was not a substantial advancement over the existing art, but even if there was, it was the nominal, logical, easily anticipated, not to use it in the patent parlance, but easily progressed step, given the same existing materials, there was nothing novel about using any of the materials that were used, in the normal ways in which they're used, to yield a predictable, previously taught, desired outcome. In other words, this is the result of a normal step in the advancement of the art, not innovation. It should be rewarded by the patent laws. Mr. Fee, the opinion written by Judge Clark, who is an experienced district court judge with considerable experience in patent cases, goes through in the analysis with a discussion of the various gram factors, beginning with section A on page 4 of his opinion, talking about the person of ordinary skill in the art, setting forth that the person of ordinary skill is a practicing prosthetist, having at least two years of clinical experience. Then, as I read the rest of the opinion, that person of ordinary skill in the art, that is a practicing prosthetist, having at least two years of clinical experience, is not mentioned again. It's just the analysis proceeds as if that section A had never been provided in the opinion in the first place. And this is typical. Opinions we see all the time. First step, and then gram 103, and now who's the person of ordinary skill in the art? Somebody says, well, it's an engineer with five years' experience, or whatever. And then it's just not discussed again. What do you make of that? Thank you for that question. What I make of it is probably what this court makes of it, which is I wish it was a little bit more expressed. I wish that there was a direct instead of implicit link-up. But what Judge Clark- Maybe what would help is if once the determination is made as to who the person of skill in the art is, that the analysis thereafter should explicitly refer to that person rather than a generic posita. And in a perfect world, I agree with you, Your Honor. And I certainly wish that we had the benefit of all gathering together and rewriting Judge Clark's opinion in a way that perhaps wouldn't lead us to be in front of this court. I mean, I'm not really criticizing his opinion in that respect. And I suspect that he, as other judges have done in the past, was fully aware of that determination when he went through and did his analysis. It just strikes me as quite curious that we see this over and over again, where it seems to me that the determination of a person of ordinary skill in the art is made in the abstract. Well, and I believe that tying it in is implicit throughout the opinion when it's the claimed advance, and I have to call it the claimed advance because, again, in all candor, I just don't see the advance. But the claimed advance is such a common-sense step. We're going to use a fabric where when we dip it, it doesn't bleed through, although the method of doing that is not part of the claim. And we're going to make it thicker, which the thickness is taught, and it wasn't addressed in the opening presentation. But the thickness and varying within those parameters is clearly taught in the prior art. So it's such a common-sense step that we don't get into, in this case, the type of real need for that analysis, perhaps, that you do in other cases where we're talking about chemical compositions. Mr. Fee, when you have the patent office having granted a patent, you do see some evidence of advances over the prior art, the elastomeric lining, the thicker distal end, the cap on the end that is molded in, and then you see the secondary considerations. Why shouldn't we give weight to those secondary considerations in light of what the patent office has done and some apparent differences? Well, Your Honor, I'm glad you asked about the secondary considerations. When you asked Mr. Stanley, you asked a specific question about the tying of those secondary considerations. And this Court has been very mindful that secondary considerations, especially the commercial success, which is the real focus of their argument, can result from many things. It may be that the time is right in that there is now an acceptance for this type of a product. It could be marketing, it could be pricing, it could be many things. And it could be the claimed invention. It could be, but unfortunately for our side, in this case, there is no record evidence. What about the emails? The emails don't point to any of the limitations in the 182 patent that aren't already present, clearly present, within Classen and the silo sheet. You asked about... Right now you're arguing that there are no secondary considerations, but that's not what the District Court held as a matter of fact. I mean, I'm looking at his opinion on 18 and 19 where this is discussed, and he basically says even assuming commercial success, even assuming a particular problem that was solved, that was known in the arts, he seems to be assuming the existence in their favor of both commercial success and long-felt need in problem solving. Then he goes on to say a strong crime efficient case overcomes it. But what I hear you doing is arguing in response to Judge Rader's question that no, those fact findings are all wrong by the District Court. They didn't establish nexus. And I'm not sure, A, it's your best avenue of attack, and, B, that the record supports you. In terms of the tying, Judge Clark did not find tying. In fact, he notes that at page 18 of his opinion, and he quotes this court in stating, the commercial success of a product can have many causes unrelated to the patentable invention, and he does not make any specific fact finding at all that there was tying. With respect to the long-felt need, we agree there was a long-felt need, but that long-felt need was also addressed by the teachings of Klassen, a single- He goes on to say commercial success is insufficient to overcome the obviousness challenge when the inventions are modest, et cetera, et cetera. I mean, if he had, as you suggest, already found that he didn't establish tying, he wouldn't need to then go on and say that commercial success is not sufficient to overcome it because, in fact, there would be no commercial success. So I'm not sure your interpretation is matching up with my interpretation. Let me take you away from this for one second because I quite frankly find your appeal of attorney's fees to be frivolous, and I'd like to give you your remaining minute and 40 seconds to address it. You've got to establish that their claim in this case was baseless because there was no litigation misconduct, and I quite frankly can't imagine how you can establish that given the presumption of validity, the fact that the same art was before the patent office during original prosecution, the patent was allowed, and now the Board of Patent Appeals has reversed and reexamined our rejection on these same two pieces of prior art. So I find the time that I have spent on your cross-appeal of attorney's fees to be a bit of a burden, and I think that it's quite frankly nearly frivolous, and I'd like you to please- Thank you, and I appreciate the opportunity to do that. There is a key point- Well, and here's why I don't believe it's frivolous. Judge Clark was able to consider substantial evidence not present before the patent office, evidence that was known to Ohio Willowood prior to the filing of the complaint and prior to the prosecution of the case to finality. They knew of the existence of the letter, the 1999 letter from Sillipost informing them explicitly, and this is the April 22, 1999 letter from Sillipost. It's found in the record at 1829 through 1841 that Sillipost in 1999 told them we had fabric-covered gel products since 1992. That was outside of anything the patent office knew about. Ohio Willowood was on actual notice. They don't dispute they were. Second is the August 14, 2006 deposition testimony of John Paul Comptese, Ohio Willowood's counsel here was present there. If I may, I'm running over, but I'm trying to answer your question. Please answer. Thank you. That deposition testimony, unrefuted by the way, establishes coding on only the inside. That evidence has never been presented ever to the patent office. Third, the April 19, 2007 deposition testimony of John Michael where he testified a fabric-coated gel liner was obvious, and he stated it unequivocally, repeatedly in his deposition. That deposition, which was prior to the filing of this lawsuit, was known. It was actually taken at the offices of Ohio Willowood's counsel. So those pieces of evidence, not present at all in any way before the patent office, put them on independent notice three separate ways, three separate times, that the claimed invention was invalid for obviousness, at a minimum invalid for obviousness, and gives rise to the only sanction possible for prosecuting a patent infringement case that they were on notice by their own expert, by Syllopos, and by John Paul Comptese, who when he testified no longer had any dog in the fight that the claimed invention had been practiced by Syllopos. So thank you. I hope that responds to this Court's concern on that issue. Thank you, Mr. Peat. Mr. Stanley. Your Honors, there has been some discussion this morning about Expert Michael's testimony about obviousness, and I point the Court to appendix page 2546, which Mr. Michael is being deposed, and he's asked, Have you ever bonded, did you ever come up with a way to bond fabric to the outside of a gel liner? Answer, not successfully, no. Question, today do you know how to do it? Answer, not in the laboratory that I would work in. I understand it can be done industrially. Question, did you ever tell anybody that you were bonding fabric to the outside of a gel liner? Answer, sure. Question, who? Answer, it was common discussion in the industry and none of us could figure out how to do it. So we ultimately had a separate nylon sheath, a textile sock, that served that purpose. I'd also like to point the Court to the briefs. This is our reply brief where the expert for the Alps company testified. He says, The technology is so much better now than it was in 1994 that I don't recommend either the single-socket gel liner or the silo sheath anymore. The liners that are available now are so much better than those items were. How do we make a distinction between an inventive advance and just the natural progression of materiel and making methods? I've thought about that, Your Honor, and I really think it comes down to this issue. You have to have a recognition of the problem, and there is nothing in the prior art where there is a recognition of the problem of gel on the outside. There's no recognition of that. Nobody is talking in any of the prior art about what happens if you have gel on the outside and how that negatively impacts an amputee's life. It was our inventor who recognized that problem and then set about fixing it. And we'd like the Court to know that at that time, nobody knew how to get gel and keep it on only one side. Imagine if you have a cup of coffee and you accidentally spill it on your clothing. If you look on the inside, the coffee has come through. And the same thing happens in these processes. It's hot, molten gel. That hot, molten gel goes through the fabric and has a tendency to come out the other side during the manufacturing process. Because of the recognition that there was a problem, this man set out for two years to try to find a way to keep the gel on only one side and then make it durable. It took a lot of attempts, because just because you keep gel on one side, some people have suggested that, well, you could take cold gel and you could glue it to the inside of the liner and the inside of the fabric. And if you do that, then you've successfully managed to put gel on only one side. There's only one problem. That will not hold up under the wear and tear of an amputee's life. But again, what about the closed end of that silo sheet? That seems to me to show the polymeric lining only on one side. There may be instances in the prior art where gel is in areas only on the inside and has not bled through in all areas. But doesn't that show that people knew how to do that? No. As a matter of fact, Your Honor, looking at that product demonstrates that they didn't know how to do it, because as you move through the product itself, you come to the gel at spots. It's not all over, but there are spots of gel that seep through that nylon material. So there was no recognition. There was reference here to Mr. Comtesse, and if you look at his testimony, what he also says is they couldn't figure out how to solve the problem until they bought a new machine. The date of the purchase of that machine conflicts with this idea that they had that concept before we did. So the... Counsel, it seems to me like your arguments are being directed towards commercial embodiments. I mean, the silo sheet's evidence was that the gel was only on one side, and if it bled through, those were rejected. Not every one was rejected, hence the manufacturing standard was gel on one side, and that's disclosed. You're arguing about longevity. Well, how long does the gel last? Maybe it bleeds through, maybe it doesn't, but none of that's in the claims. The claims don't require gel on one side for one year. The claims just say gel on one side, and silo sheet discloses that. The silo sheet, we strenuously object, does not teach gel on only one side. Looking at that product reveals that gel comes through on that product in several places. The testimony that you're referring to, Your Honor, was from a biased observer and someone who had... What about the advertising? The advertising, Your Honor, was, again, not a recognition of the problem. The advertising simply showed, I believe what you may be referring to is... JA 1920 shows it on just one side. But there was no teaching that it would need to stay on only one side, and that was the innovation, in our view. But it discloses it on only one side, and your claim covers it on only one side. Are you saying somehow the disclosure of only one side maybe isn't enabling? That's not an argument you raised below, so you can't make that on the first time on appeal. An artist's rendering of that particular product does not arise to the level of a teaching that gel on only one side was an issue. And that product has nylon. It's very thin nylon. There is no possible way you can put any kind of liquid product on nylon and not have it go through the other side, which is why it took our inventor two years to come up with a way in which he could keep gel on only one side. It was talked about. It was considered. It wasn't really possible until our inventor showed the world how that was done. The other thing about the silo sheet is this stand-alone interface concept. So the stand-alone interface that we developed as a cushion liner creating a whole new product category class is clearly differentiating from the silo sheet. The silo sheet could not stand alone on itself, and there was plenty of evidence that it required additional socks to do that. I thank your honors for your time this morning. Thank you, Mr. Stanley.